HELEN J. STEINER, Appellant, v HARRY WENNING, Respondent.

Second Department, July 12, 1976

438

*Helen J. Steiner,* appellant *pro se.*

*Hart & Hume (Joseph A. Bergadano* of counsel), for respondent.

HAWKINS, J. This appeal is from a judgment in favor of the defendant upon the trial court's denial of plaintiff's motion, upon oral argument, after a jury had been selected, to amend the complaint so as to plead a cause of action for breach of contract and to strike the defendant's affirmative defense that the action is time-barred by the three-year Statute of Limitations (CPLR 214) and upon granting the defendant's cross motion to dismiss the action as time-barred.

On December 9, 1963 the parties entered into a written agreement whereby the plaintiff engaged the defendant, an architect, to prepare plans for the design and construction of a one-family house. The defendant rendered such professional

services during the following two years. The house was completed in 1965. The certificate of occupancy was issued on May 27, 1965. Plaintiff began occupancy on May 3, 1965. The last items of work, the black-topping of the driveway and the installation of a floor slab in the garage, were completed in December of that year. This action was commenced in December, 1969.

*Inter alia,* the contract, the standard American Institute of Architects (A.I.A.) form, provided that: (1) the defendant would (a) prepare studies, drawings and specifications; (b) confer with persons desiring to enter into contracts for work on the project; (c) issue certificates for payments, (d) "supervise the work being done * * * or [the] furnishing [of] materials"; and (e) guard against noncompliance by any contractor, "but the architect does not thereby guarantee the performance by any contractor or other person of his, its or their contracts"; and (2) the defendant's "supervision is to be distinguished from the continuous personal superintendence which can be obtained by the employment of a clerk-of-the-works. However, the architect specifically agrees and covenants that he will be at the premises at least three times a week to carry out his duties of supervision." The stated fee was 10% of the cost of the project. It was to be paid at listed amounts and percentages at various stages of construction, with the last part to be paid at the time of the issuance of the certificate of occupancy.

The plaintiff, a lay person, prepared her own complaint and did not engage counsel until some four months before the trial. She is acting on her own behalf on the instant appeal. In the colloquy upon the motion at Trial Term, the Justice presiding commended the plaintiff's efforts in drawing the pleadings, but added that if he were requested to reform the complaint, it would, nevertheless, emerge "substantively" in "malpractice". The plaintiff's then attorney, in support of the motion, urged that "the complaint has verbiage sounding in tort and in contract." He further argued that the plaintiff "copied the verbiage from form books, which she did not know the value of, and what to do" and that the architect had not guaranteed a result as in the instances of a doctor effecting "a cure" or a lawyer guaranteeing that he "will win a case for the party." The specific guarantee alleged is that the house would be completed no later than August 1, 1964.

This court has also considered whether the three- or six-

year Statute of Limitations is applicable where an owner, aggrieved by the architect's services, seeks redress (see *Sears, Roebuck & Co. v Enco Assoc.,* 54 AD2d 13). Until the advent of *Matter of Paver & Wildfoerster (Catholic High School Assn.)* (38 NY2d 669) in February, 1976, the cases held, with some measure of uniformity, that absent a "special agreement" as sometimes is found in a physician-patient relationship involving a guaranteed cure, or in an owner-architect contract containing a guarantee of continuous and more-than-routine supervisory services, the three-year period applied. No matter the precise terminology of the plaint, or the endeavors to anchor the action to contract rather than tort, the "reality" and the "essence" are in tort and not in contract (see *Carr v Lipshie,* 8 AD2d 330, affd 9 NY2d 983; *Brick v Cohn-Hall-Marx Co.,* 276 NY 259, 264; *Glens Falls Ins. Co. v Reynolds,* 3 AD2d 686).

*Paver,* decided during the pendency of this appeal, is of little solace to the plaintiff. The crux of that holding is that when the contract provides for arbitration, and that remedy has been invoked, arbitration lies despite the action being time-barred at law by the three-year Statute of Limitations or by CPLR 7502 (subd [b]), which bars arbitration if the claim is time-barred.

We have considered the impact of *Paver* in deciding *Sears, Roebuck & Co. v Enco Assoc.* Here, as in *Sears,* neither party has invoked arbitration; thus there is no departure from or variant of the rule set forth in *Sosnow v Paul* (36 NY2d 780). *Sosnow* held that the date of accrual of an action in malpractice runs from the date the architect last rendered services. The "reality" and the "essence" approach in determining whether the three-year tort or six-year contract Statute of Limitations applies remains unimpaired by *Paver.* The existence of a contract calling for professional services does not, *ipso facto,* make applicable the contract Statute of Limitations. As long ago as 1888, in *Webber v Herkimer & Mohawk St. R.R. Co.* (109 NY 311), the Court of Appeals held that although a passenger who had sustained injuries had entered into a contract at the time of purchase of the ticket of passage and that there necessarily had been a breach in failing safely to transport, the essence of the action was the failure to use due care. Thus, there was negligence or malpractice, and not breach of contract.

In *Alyssa Originals v Finkelstein* (22 AD2d 701, affd 24

NY2d 976), we held that a tenant seeking redress from his landlord for damages caused by a leaking roof was proceeding in tort and not for breach of the lease. Accountants who had failed to detect a bookkeeper's false entries were held liable for malpractice and not for breach of contract (see *Carr v Lipshie, supra).* That negligence is the critical factor rather than breach of contract in an actual or implied contractual situation is evident from *Blessington v McCrory Stores Corp.* (305 NY 140), where a products liability situation permitted the six-year statute since there was no need to prove negligence.

A "bifurcated" approach, as suggested by the dissent, whereby functions of supervision are separated from those of drawing plans, etc., is similarly unavailing. It may well be that, under the Education Law, one who supervises construction work need not be a licensed architect or engineer. For responsibility to attach to an architect performing such supervisory services, there would be required specific contractual provisions encompassing such services. Here the contract expressly excepts such continuing services.

The Trial Term correctly denied the belated application to amend the complaint. No attorney, no matter the semantic gymnastics, could under the facts transform the pleading to contract, for: "[t]he nature of the charge of malpractice is not changed by failing to sufficiently state it in necessary detail, or by putting it in language suitable to the statement of a cause of action on contract, omitting the usual allegations as to the absence of skill and negligence" *(Horowitz v Bogart,* 218 App Div 158, 160).

Had the complaint been amended as proposed, and all allegations of lack of professional competence or negligence deleted, it would still not have availed the appellant (see *Hurlburt v Gillett,* 96 Misc 585, affd 176 App Div 893). It is not the phraseology, but rather the reality or essence of the plaint which controls. As we held in *Liebler v Our Lady of Victory Hosp.* (43 AD2d 898): "A cause of action in contract, as distinguished from one in malpractice, must be based upon the breach of a particular or special agreement *(Robins v Finestone,* 308 NY 543; *Colvin v Smith,* 276 App Div 9; *Keating v Perkins,* 250 App Div 9). An allegation of failure to provide medical care or failure to provide medical service in a proper manner is insufficient, for it is merely an attempt to

plead as a contract action one which is essentially a malpractice action."

Pre-*Paver,* there was little judicial doubt that the plaintiff's sole recourse was in malpractice. If so, the action is time-barred. The question remains whether *Paver* has opened the floodgates or has so eroded or blurred the former confines distinguishing malpractice from contract as virtually to render the six-year statute applicable no matter how tenuous the claim of any continuing obligation on the part of the professional. In our opinion, it does not. *Paver* holds that where the parties, by contract, provided for arbitration, and resort has been had to arbitration, the arbitrator is not then bound by the former constricting rules segregating breach from delict. Hence, the arbitrator could proceed to adjudicate the parties' claims and determine liability under either doctrine. As the court noted in *Paver (supra,* p 672): "[i]n determining whether a claim for property damage is barred by the Statute of Limitations, however, the court should not be constrained by the special rules developed largely in personal injury actions and which depart from the general principle that time limitations depend upon, and are confined to, the form of the remedy. The remedies available in arbitration are, of course, not confined to traditional forms at law. Thus, if a claim is substantially related to matters encompassed by the substantive agreement, it is immaterial, in applying the Statute of Limitations, whether it lies in 'contract' or 'tort'. Hence, the owner's claim against the architects, although cognizable in law in either contract or tort malpractice, was timely asserted within the six-year period of limitations."

Under the circumstances at bar, the plaintiff cannot avail herself of the longer Statute of Limitations; such unavailability is not attributable to a lack of skill in drawing the complaint or in failing to use appropriate words of art. Her recourse was in malpractice and she failed timely to assert her rights.

The dissenting opinion observes, not without some cogency, that, paradoxically, an owner may have six years in which to proceed against a plumber, but only three years for redress against an architect. However, it would make the longer period applicable by bifurcating the architect's services. When performing supervisory duties, he would be reclassified and

denigrated as rendering mere "artisanship" services, rather than being engaged "in the profession of architecture".[1]

It would appear that the dissent has proceeded "after the manner of Procrustes"[2] by so stretching the contract's incidental provision for supervision, despite its express limitations, as to render every A. I. A. contract subject to the six-year Statute of Limitations. This extended period would obtain despite the failure of either party to invoke arbitration. Absent resort to arbitration, the limitations of the "traditional forms at law" prevail and the "exceptions" are "not to be proliferated" (see *Matter of Paver & Wildfoerster [Catholic High School Assn.],* 38 NY2d 669, 676, *supra).*

Disparate rules are not necessarily invidious. Very recently the Legislature, by amending CPLR 214 and adding CPLR 214-a (L 1975, ch 109), has provided for a lesser Statute of Limitations in medical malpractice actions, but has retained the three-year statute with respect to other professions.

As we observe in our opinion in *Sears* (54 AD2d 13, 19, *supra),* "the 'reality' or 'essence' approach does not truly provide a ready yardstick, for reality, like beauty, may lie in the eye of the beholder. In squaring *Paver* to the instant appeal, we do not believe it necessary to squeeze the facts into the *Paver* mold, for, properly understood, it is limited to the facts. In resorting to arbitration, the traditional and constricting rules applicable to actions at law in negligence have been contractually waived by the parties. Thus the parties, by virtue of their contract, CPLR 7502 (subd [b]) notwithstanding, may resolve by arbitration what they could be time-barred from doing at law. *Paver* expressly and definitively so holds. An arbitrator need not be concerned with neo-scholastic disputations and exegeses to determine whether the genesis is *ex contractu* or tortious."

The dissent, I believe, does not draw the appropriate distinctions between arbitration and actions at law. In commenting upon *Matter of Naetzker v Brocton Cent. School Dist.* (50

---

1. The dissent's "bifurcated" approach, we believe, creates unacceptable classifacations segregating functions not necessarily requiring an architect's license from those which, by law and custom, are imposed upon the totality of the profession's obligations. Such conversion brushes aside the purposes and functions of State licensing. Moreover, it could readily be applied to services rendered by physicians and lawyers in many instances other than in an unrelated tort occurring in a physician's office, as postulated by the dissent.

2. See Pound, An Introduction to the Philosphy of Law (rev ed) p 72.

AD2d 142), the Court of Appeals stated in *Paver* (38 NY2d 669, 677, *supra):*

"The arbitration limitation statute was hardly intended to do that. Its purpose was to bar stale claims, not to fragmentize claims into legal categories, the very categories from which arbitration frees *those who choose arbitration as their mode of dispute determination.*

"It is also evident that a complex of facts in legal analysis may present a facet of contract law, or tort law, of quasi-contracts, or equity jurisprudence. These are legal concerns and legal definitional boundaries which prescribe the mode of judicial dispute determination. These are not the concerns or the boundaries of arbitrational dispute determination, nor should they be made so indirectly" (emphasis supplied).

Whether described, as in the dissent, as a "ritualistic contract of adhesion", in referring to the A. I. A. contract, or whether the relationship had less formal antecedents, nevertheless, the particular period of limitation may well "depend upon the form of the remedy."

In resorting to arbitration, where so provided by contract, CPLR 7502 (subd [b]) to the contrary notwithstanding, litigants may have resolved by arbitration what they could be time-barred from having adjudicated at law. The dissent's extended quotation from *Paver,* relating to the timeliness of the demand for arbitration, is followed by explanatory and significantly restricting language *(supra,* pp 675-676): "In any event, whatever its validity today and whatever its relation to larger general principles, the rule of the *Webber* case and those in its wake should not be blanketed to cover arbitration, an area of dispute determination not confined to the forms and procedural channels of the law. There is little authority, and none controlling, which has applied the *Webber* exception to arbitration as distinguished from actions at law."

It perforce follows, we reiterate, that the *ratio decidendi* of *Paver,* involving both claims of "defects of design" and "faulty supervision", is that those who choose arbitration are "not confined to the forms and procedural channels of the law" *(Matter of Paver & Wildfoester [Catholic High School Assn.] supra,* p 676).

Accordingly, the order of Special Term should be affirmed.

SHAPIRO, J. (dissenting). The majority takes the flat-footed position that any action by an owner for damages to its

buildings caused by an architect's improper performance of his contractual obligation *relating to supervision of construction* is governed by the three-year malpractice Statute of Limitations (CPLR 214, subd 6) to the exclusion of the six-year Statute of Limitations relating to breach of contract (CPLR 213, subd 2). In doing so, the majority relies upon *Sosnow v Paul* (43 AD2d 978, affd 36 NY2d 780) and distinguishes the contrary determination reached in *Matter of Paver & Wildfoerster (Catholic High School Assn.)* (38 NY2d 669 [which dealt with complaints against an architect both for defects in designs and fault in supervision of construction]) on the ground that the court was there dealing with a contract which included an arbitration provision. I do not so read the *Paver* case and I therefore dissent. Before analyzing the *Sosnow* and *Paver* cases it would seem in order to analyze prior decisions dealing with the general issue here involved.

In *Webber v Herkimer & Mohawk St. R.R. Co.* (109 NY 311, 314-315), the court held that the liability of a carrier to a passenger is governed by the negligence Statute of Limitations, despite the contract of carriage, stating that "The form of the action, whether *ex contractu* * * * or *ex delicto* does not affect the case * * * The liability of the defendant, as a carrier of passengers, is referable to the question of its negligence." The cases "in its wake" applied the rule that where lack of due care is the essence of the wrong, the ambience or inceptual relationship of contract is to be ignored and the more restrictive limitation period of torts or malpractice is to be applied (see *Calhoun v Gale,* 29 AD2d 766 [as to physicians]; *Hurlburt v Gillett,* 96 Misc 585, affd 176 App Div 893 [as to dentists]; *Carr v Lipskie,* 8 AD2d 330 [as to accountants]; *Alyssa Originals v Finkelstein,* 22 AD2d 701 [as to a landlord's breach of covenant of repair resulting in damage to a tenant's property]; *Schmidt v Merchants Despatch Trans. Co,* 270 NY 287 [as to an employer's failure to provide a safe place to work]). The converse of this principle was applied in *Brick v Cohn-Hall-Marx Co.* (276 NY 259, 264), which held that an action for royalties was subject to the contract Statute of Limitations, not that of fraud-from-date-of-discovery, since there contract, and not tort, was the "reality, and the essence".

So ingrained and seemingly imbedded was this doctrine that in *Sosnow v Paul (supra),* an action against architects, the parties agreed ("rightly or wrongly" said the court in *Paver)*

that the three-year malpractice statute was applicable, and they confined themselves to the issue of whether the action accrued on completion of services or on discovery of defect.

*Paver* requires reappraisal of the issue. Though stress was there laid on the exceptional features of arbitration, which called for application of the contract Statute of Limitations in the diffuse complex of relationships between an owner and its retained architect (see *Matter of Paver & Wildfoerster [Catholic High School Assn.], supra,* pp 675-678), the court nevertheless refused to apply the rule that where lack of due care by the architect is the "reality" or the "essence" of the claim, it was the malpractice period of limitations alone that governed.

*Paver* thus put into question the wisdom of applying the categorical fiat of the malpractice limitations period to *all* proceedings by an owner involving complaints against an architect. Noted by Chief Judge BREITEL (p 672), writing for the majority, were the facts that such claims involved property or pecuniary interest only (as distinct from "special rules developed largely in personal injury actions"); that they related specifically to "matters encompassed by the substantive agreement" and "the general principle that time limitations depend upon, and are confined to, the form of the remedy."

We should not ignore the invitation to inquiry implicit in the Chief Judge's questioning interjection (p 675) about "the rule of the *Webber* case and those in its wake", "whatever its validity today". Nor should we ignore the fact that the Chief Judge also made reference (pp 676-677) to the fact that in *Sosnow* the parties "had agreed, *rightly or wrongly,* that the three-year statute was applicable" and "[n]otably, [that] the Appellate Division's implicit approval of this stipulation was cast in doubt by this court's application of the contract measure of damages to the cause of action for the architect's 'malpractice'"; statements made independently of the issue of arbitration *per se.*

I believe that the underlying rationale of the Chief Judge's opinion in *Paver* that it is the *essence* which determines whether the tort or contract Statute of Limitations should be applied, far from operating to bar the plaintiff owner's action here, requires a holding that actions against architects, at least for failures in supervision of construction, are in *essence* actions for breach of contract, and only incidentally (and additionally) actions in malpractice.

The construction of a building involves a complex of con-

tractual relationships between the owner and architects, engineers and building contractors, and perhaps electricians, plumbers and others. In this sense, the retaining of an architect differs from the retention of a physician, a dentist, a registered nurse, or a certified accountant. Traditionally (and it was so in this case), the execution of the ritualistic contract of adhesion prepared by the American Institute of Architects constitutes the juridical fact that the architect has been retained, and it is that contract that meticulously spells out the duties, responsibilities and obligations of both parties. Manifestly, there is no analogous inception in the physician-patient relationship or in the simple purchase of a railroad ticket.[1]

As pointed out in *Paver (supra,* p 675): "when the action is one for damages to property or pecuniary interests only, where there is a contractual agreement between the parties, the general tendency has been to allow the plaintiff to elect to sue in contract or tort, as he sees fit". Cited by the court was American Law Reports, Third Series (vol 1, pp 914, 916-917, Ann, Limitation Period—Building Contract), wherein the writer, referring to an action by a contractee for defective or improper performance of work by a private building contractor, stated that "the essence of the decisions * * * [are] that where a tortious wrong also amounts to a breach of contract, and the plaintiff sues for the breach, his contract remedy is not barred merely because his tort remedy would have been barred." Thus, concluded the writer, actions alleging property damage to the owner due to defective plumbing, heating, and carpentry work, are generally deemed (at least additionally)

---

1. In its opinion the majority cites the obligation of the architect as resting upon the language of the AIA contract which, *inter alia,* reads: "(D) to supervise the work being done * * * or [the] furnishing [of] materials * * * (E) to guard against any noncompliance by any contractor * * * but the architect does not thereby guarantee the performance by any contractor or other person of his, its or their contracts. (2) * * * his supervision is to be distinguished from the continuous personal superintendence which can be obtained by the employment of a clerk-of-the-works. However, the architect specifically agrees and covenants that he will be at the premises at least three times a week to carry out his duties of supervision."

Thus, the contract states that the architect will "supervise the work being done * * * or [the] furnishing [of] materials". Whether the architect in this case improperly did so (or whether the defalcation was due to the nonexistence of a "clerk-of-the-works") is a substantive issue for trial—*unrelated to limitations.*

It is clearly illogical to maintain that because the architect need not give "continuous personal superintendence", he has no obligation whatever to "supervise the work being done".

as actions *ex contractu* and therefore protected by the longer Statutes of Limitations applicable thereto.

In such cases it is the defect in the quality of the work done that constitutes breach of contract regardless of whether it was due to negligence or other reason, just as would be a short delivery by a materialman, i.e., a defect in quantity. That negligence might or might not be the underlying reason for the defect is irrelevant (cf. *Blessington v McCrory Stores Corp.,* 305 NY 140).

The unfairness of excluding such protection to the owner in an action against the architect is compounded when we consider that such action accrues upon the termination of the relationship, and not upon the discovery of defective performance (see *Sosnow v Paul,* 43 AD2d 978, affd 36 NY2d 780, *supra).* The result is that an owner has six years in which to discover latent defects in a building and to maintain an action for damages if he sues the contractor (or the plumber or electrician or carpenter), but only three years if he sues the architect. I do not believe that the grant of professional status to architects, and of exclusivity of the right to recover for architectural services (see Education Law, § 7302; see, also, *American Store Equip. & Constr. Corp. v Dempsey's Punch Bowl,* 174 Misc 436, affd 258 App Div 794, affd 283 NY 601), was intended to grant a time immunity against suit greater than that granted to other experts involved in construction. Where much is given, more, not less, should be expected in return. *Noblesse oblige.*

Nevertheless, whatever its unfairness or want of logic in a particular case, the fiat of Statutes of Limitations is to be accepted where it is clear that there is no alternative. However, as indicated, *Paver* compels examination of the question whether actions against architects for defective performance invariably are actions whose essence is the tort of malpractice. In my opinion, where the gravamen is improper supervision of construction, the essence is breach of contract and only incidentally malpractice and, therefore, the plaintiff's motion to amend her complaint—if indeed amendment was necessary—should have been granted.

### THE DIFFERENT ASPECTS OF THE PRACTICE OF ARCHITECTURE

Section 7302 of the Education Law requires licensing for the practice of architecture. Former section 7301 defined that practice as follows: "The practice of the profession of architecture is defined as rendering or offering to render services in

connection with the design and construction of structures which have as their principal purpose human habitation or use, and the utilization of space within and surrounding such structures, *including planning, providing preliminary studies, designs, drawings and specifications, construction management and administration of construction contracts* safeguarding life, health and property" (emphasis supplied).

The statute includes "administration of construction contracts", which might indicate that that is *exclusively* for architects. However, no case (New York or elsewhere) has held that supervision (i.e., "administration") of construction contracts, by itself, requires licensing for the "practice of the profession of architecture", and it would seem contrary to ordinary experience to believe that it does. It should be noted that section 7201 of the Education Law, which defines the "practice of the profession of engineering" (which also requires licensing), includes therein the term "supervision of construction * * * in connection with any * * * buildings", which shows that "supervision" (clearly synonymous with "administration of construction contracts") is not confined to the practice of architecture.

It has been stated (5 Am Jur 2d, Architects, § 3, p 664): "What amounts to architectural services within license requirements is a question which has arisen in a number of cases, and in the determination of the matter the particular license regulations which are applicable, and also the circumstances present in each instance, are important factors to be considered. *It is generally held that designing a building for another, or the furnishing of plans and specifications for such a building, constitutes architectural services. On the other hand, supervision of the actual construction of a building is not, of itself, the practice of architecture within the purview of licensing statutes*" (emphasis supplied).[2]

The case of *McDowell v City of Long Beach* (12 Cal App 2d 634) involved the interpretation of a statute permitting unlicensed persons, under certain conditions, to furnish plans and specifications for construction of a building. However, the plaintiff had also supervised construction, and it was argued that *this* constituted practice of architecture, contrary to the licensing statutes. The court said (pp 637-638):

"Appellant's contention is that an unlicensed person may do

2. The current version of section 7301 (see L 1972, ch 923) is, insofar as the instant case is concerned, to the same effect.

nothing more than prepare plans and data, and that as plaintiff performed other services which, it is claimed, constituted the practice of architecture, and as the contract was entire and called for services he could not legally perform, that it was void. The argument assumes that supervision of construction of a building is the practice of architecture regulated by the statute. *While architects, as a common practice, supervise construction, which work they may undertake, as plaintiff did, in connection with the furnishing of plans and specifications, it does not result that such supervision is the practice of architecture. Not every one who supervises construction is an architect, nor is he thereby practicing architecture.* 'One who makes plans and specifications for a building, and superintends its construction, is an "architect". *In fact, the rule most commonly applied does not embrace the duty of supervision.' (Payne v De Vaughn,* 77 Cal. App. 399 [246 Pac. 1069.) When the statute refers to the 'practice of architecture' and to 'furnishing plans or other data for buildings', the former expression is not used in any broader sense than the latter; in other words, the preparation of plans and data is used as synonymous with 'practice of architecture'. *In allowing an unlicensed person under certain conditions to prepare plans and data, the statute does not expressly grant him the right to supervise construction, but neither does it withhold that right, nor could it be arbitrarily withheld from him while all others were allowed to exercise it.*

"Under the facts established, plaintiff's services in preparing plans and data were expressly authorized by the law; *his services, consisting of supervision of construction, were not prohibited"* (emphasis supplied).

In *Holiday Homes v Briley* (122 A2d 229 [Mun Ct of App for the Dist of Col], the court discussed the applicability of a statute prohibiting the practice of architecture by one not licensed as such. It said (p 231): "Briley testified that he was employed to supervise the complete operation; to investigate the plant layout, production schedules and type of construction; and to see what could be done to reduce costs and make the business a profitable one. Support for the view that *he was hired in a general supervisory capacity* is found in the testimony of Mr. Selden, who testified in substance that he employed Briley as someone who could assist him in the operation of the business due to his knowledge of construction and architecture. *We do not think the court was required to hold that the discharge of the duties outlined above constituted the*

*practice of architecture within the meaning of the Act; nor do we construe the Act \* \* \* to preclude all supervision of performance by one who has a knowledge of architecture"* (emphasis supplied). (See, also, 82 ALR 2d 1013, 1015.)

It is thus clear that an architect's duties must be considered as bifurcated. The drawing of plans and specifications are solely and uniquely the practice of the *profession* of architecture. Defects in that area constitute *professsional* defalcation (i.e., malpractice). On the other hand, supervision of construction involves *artisanship;* although included in the ambit of what a licensed architect may do, it is clearly an adjunct which anyone with expertise may do, absent a statute prohibiting it. That being so, it is manifestly unfair to apply a shorter Statute of Limitations to an architect than to some other artisan who may legally perform that work. Otherwise (and in the light of *Sosnow [supra])* a knowledgeable and prudent owner would be better advised to have a nonarchitect supervise construction so that he would have an additional three years in which to learn of defects of performance not ascertainable at the time of completion. An absurd result so contrary to the customs and usages of the trade should not be encouraged by judicial interpretation.

There is nothing unusual about scrutinizing the nature of the claim (rather than merely whether the defendant is a professional) to determine whether the malpractice statute or some other Statute of Limitations applies., Thus no one can doubt that if a patient tripped on a raised tile in his physician's office the negligence (three years) and not the present malpractice (two years and six months) Statute of Limitations, would apply. Also, although we recently held in *Murriello v Crapotta* (51 AD2d 381) that an action against a physician for lack of informed consent, for limitations purposes, constituted malpractice and not assault, we indicated that a situation similar to that in *Schloendorff v Society of New York Hosps.* (211 NY 125 ["breach of a patient's instructions not to have surgical intervention and/or a specified course of medical treatment"]) would be deemed an assault for limitation purposes (see *Pearl v Lesnick,* 19 NY2d 590). And of course still viable is the rule that a physician's promise of a cure is subject to the contract limitations period *(Conklin v Draper,* 254 NY 620; *Frankel v Wolper,* 181 App Div 485, 486, affd 228 NY 582; *Robins v Finestone,* 308 NY 543).

The essence here is breach of contract, no less than an

action by the owner against the contractor would be. Hence, I cannot agree with the majority, based on its reading of *Paver,* that: "Under the circumstances at bar, the plaintiff cannot avail herself of the longer Statute of Limitations; such unavailability is not attributable to a lack of skill in drawing the complaint or in failing to use appropriate words of art. Her recourse was in malpractice and she failed timely to assert her rights."

In *Paver* (38 NY2d 669, 673-674, *supra)* Judge BREITEL held just to the contrary for, after citing the provisions of CPLR 7502 (subd [b]), he said:

"The right to demand arbitration under the agreement was a contractual one. Thus, as the Appellate Division unanimously agreed, the demand was timley made within the six-year period of limitation insofar as the arbitration clause was involved (CPLR 213, subd 2; see *Matter of Travelers Ind. Co. [De Bose],* 226 NYS2d 16, 20; *Reconstruction Finance Corp. v Harrisons & Crosfield,* 204 F2d 366, 369, cert den 346 US 854; see, generally, Arbitration-Limitations-Laches, Ann., 37 ALR2d 1125, 1126-1127).

"CPLR 7502 (subd [b]) provides, however, that '[i]f, at the time that a demand for arbitration was made * * * the claim sought to be arbitrated would have been barred by limitation of time had it been asserted in a court of the state, a party may assert the limitation as a bar to the arbitration on an application to the court as provided in section 7503 [application to stay arbitration]'. *The purpose of the statute was to apply the Statute of Limitations referable to the substantive issue to arbitration proceedings, and to permit it to lie as a bar to the arbitration proceeding* (see NY Legis Annual, 1959, p 12). As was stated in *Matter of Cohen* (17 AD2d 279, 282): 'Section 1458-a [the predecessor to CPLR 7502 (subd. [b]) was proposed upon the basis that *"The same considerations of public policy which make stale claims in actions at law unenforceable also apply to disputes in arbitration."* Specifically, it was enacted to eliminate the confusion theretofore existing in the decisions as to whether a proceeding in court could be invoked to enforce the defense of the Statute of Limitations or whether the applicability of the defense was in the sole discretion of the arbitrators. (N.Y. Legis. Ann., 1959, pp. 12, 13, 27.)' (See *Matter of Plastic Molded Arts Corp. [A & H Doll Mfg.],* 23 Misc 2d 839, 841, affd 11 AD2d 668; *Matter of New York Cent. R. R. Co. [Erie R. R. Co.],* 30 Misc 2d 362, 368-

369; *Skidmore, Owings & Merrill v Connecticut Gen. Life Ins. Co.,* 25 Conn S 76, 88-91; cf. Fourth Preliminary Report of the Advisory Comm on Practice and Procedure, NY Legis Doc [1960], No. 20, at pp 77-78.) In proceedings authorized by a prior agreement to arbitrate future disputes, it is for the court to determine whether the claim, and therefore the arbitration, is barred by the Statute of Limitations (see *Matter of Caudill, Rowlett, Scott [Board of Educ.],* 47 AD2d 610; *Matter of Schlaifer [Kaiser],* 46 AD2d 850; *Matter of Andresen & Co. v Shepard,* 45 AD2d 578, 579; *Matter of Cohen,* 17 AD2d 279, 283, *supra* [by implication]; *Hammerstein v Shubert,* 127 NYS2d 249, 251; 8 Weinstein-Korn-Miller, NY Civ Prac, par 7502.14).

"*Thus, it is necessary to consider if, at the time the demand was made, the claim sought to be arbitrated would have been barred by the Statute of Limitations had it been asserted in court (CPLR 7502, subd [b]).* The 'claim' in the instant case, as stated in the demand for arbitration, is one for '[b]reach of contract' by the architects, 'by reason of defects in design and faulty supervision in the execution of their contract with the claimant'. *More specifically, the owner's petition alleges architectural omissions in design, that the plans and specifications were contradictory, and that the architects failed to notice or report to the owner that the contractor had failed to comply with certain specifications. Also in its petition, however, in addition to breach of contract, the owner alleged that the architects 'failed to fulfill their common law duty to exercise reasonable care and skill in the performance of their contracts.' Thus the owner's claims would be cognizable in law in either contract or tort malpractice*" (emphasis supplied).

Under the circumstances the judgment appealed from, which the majority is affirming as a matter of law, should be reversed, the complaint should be reinstated and the plaintiff's motion should be granted to the extent of permitting an amendment of the complaint.

HOPKINS, Acting P. J., and LATHAM, J., concur with HAWKINS, J.; SHAPIRO, J., dissents and votes to reverse the judgment, reinstate the complaint, grant plaintiff's motion for leave to amend the complaint and deny defendant's motion to dismiss the complaint, with an opinion, in which MARTUSCELLO, J., concurs.

Judgment of the Supreme Court, Westchester County, en-

tered March 27, 1975, affirmed, without costs or disburse-
ments.